UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:17-CR-537 |
| | § | |
| LORETTA MARKS, *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER ON AMENDED MOTION TO SUPPRESS
AND FOR THE RETURN OF PROPERTY**

Before the Court is Defendant Loretta Marks's amended motion to suppress evidence and for the return of property (D.E. 153). One of twelve defendants named in the superseding indictment (D.E. 7), Marks is charged with (1) one count of conspiring to launder the proceeds of an illegal gambling business, in violation of 18 U.S.C. § 1956; and (2) one count of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955. She has moved to suppress evidence and to return property seized pursuant to search warrants relating to four residential addresses and a safe deposit box. For the reasons below, the motion is DENIED.

**FACTS**

This case arises from an investigation into illegal gambling operations in South Texas. As described in the affidavits accompanying the various search warrant applications, federal law enforcement agents learned from a cooperating defendant in December 2015, that Marks was operating an illegal gambling room called the Copper Penny in Woodsboro, Texas. The affidavit states that the Copper Penny housed a large

number of electronic "8-liners," games of chance similar to slot machines, which are prohibited by Texas law when configured to allow a player to win more than $5 per spin. *See* Tex. Penal Code §§ 47.01, 47.03. Marks did not herself own all of the machines in the Copper Penny. Rather, she allowed the machines' owners to keep them there in exchange for the lion's share of the profits.

In June 2016, the cooperating defendant approached Marks under the guise of getting involved in gambling operations at the Copper Penny. Marks agreed to allow the cooperating defendant to install up to twenty machines in exchange for 80% of the machines' profits.

Between July and December 2016, the cooperating defendant maintained approximately eleven machines at the Copper Penny. During that time, the cooperating defendant, or an undercover federal agent pretending to be the cooperating defendant's associate, met with Marks at least eight times, either at the Copper Penny, or at a residential address in Agua Dulce, Texas, which Marks said was her office. Over the course of these meetings, the cooperating defendant and the undercover agent collected over $40,000 in cash, representing their share of the Copper Penny's proceeds.

During one such visit, in November 2016, Marks drove the cooperating defendant to an address on La Paloma Road in Bishop, Texas, which Marks said housed another of her game rooms. Subsequent surveillance confirmed that there was indeed an illegal gaming room operating at the Bishop address.

In December 2016, Marks wound down her operations at the Copper Penny. Shortly before doing so, she told the undercover agent that she was closing the Copper

Penny because federal law enforcement had recently discovered the only other gambling room in Woodsboro. She told the undercover agent to delete his text messages and not to call her. A week later, law enforcement surveillance watched as Marks's associates removed the gambling machines from the Copper Penny.

The next week, in a meeting in her Agua Dulce office, Marks invited the undercover agent to join her operation in a different gambling room, located on County Road 30 in Robstown, Texas. Approximately five machines, ostensibly belonging to the undercover agent, were installed at that room in February 2017. Later surveillance confirmed the machines in this room also offered payouts in excess of those permitted by Texas law.

By April, the investigators were ready to bust the ring. On or around April 27, 2017, federal law enforcement agents applied for search warrants to search Marks's Agua Dulce office, the game rooms in Bishop and Robstown, and Marks's residence in Sealy, Texas. Law enforcement identified the Sealy residence through public records, bank account records, officer surveillance, and GPS "ping" data showing where Marks used her cell phone.

The federal magistrate judge issued the requested warrants. While executing the warrant to search the Sealy address, federal agents found and broke open several safes, where they discovered large amounts of cash, among other things, hidden inside. The agents also seized certain property found during the search, including Marks's Cadillac Escalade and several luxury watches.

Finally, the search of the Sealy residence discovered records referencing a safe deposit box at a Citizens Bank branch in Sealy. Law enforcement secured a warrant to search that safe deposit box and found approximately $279,000 inside.

Marks now asks the Court to suppress the fruits of the searches and order the seized property returned to her.

## ANALYSIS

### A. The Good Faith Exception Applies

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The customary remedy for a Fourth Amendment violation is to exclude the illegally obtained evidence from trial. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

The "sole purpose" of the exclusionary rule, however, is "to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). For that reason, the "good faith exception" to the exclusionary rule "bars the application of the exclusionary rule to exclude evidence obtained pursuant to a warrant if law enforcement officers act under an objectively reasonable, good faith belief that the search warrant in question is valid—even if it, in fact, is not." *United States v. Jarman*, 847 F.3d 259, 264 (5th Cir. 2017).

The Fifth Circuit employs a two-step process to evaluate a motion to suppress the fruits of a search conducted pursuant to a warrant. *See United States v. Massi*, 761 F.3d 512, 525 (5th Cir. 2014). First, the Court considers whether the good faith exception

applies; if it does, "the court need not reach the question of probable cause." *Id*. (quoting *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1130 (5th Cir. 1997)) (internal quotation mark omitted); *see also United States v. Moore*, 805 F.3d 590, 593 (5th Cir. 2015) ("Our analysis usually ends if the good faith exception applies.").[1] The second step of the analysis, which is necessary if no good faith exception applies, "requires the court 'to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed.'" *Massi*, 761 F.3d at 525 (quoting *Pena-Rodriguez*, 110 F.3d at 1129).

Courts have identified four scenarios when the good faith exception will not apply:

> (1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*United States v. Woerner*, 709 F.3d 527, 533–34 (5th Cir. 2013). Marks has challenged (1) whether probable cause existed to issue the warrants; and (2) whether the warrants were sufficiently particularized.

---

[1] An exception is where the question of probable cause "presents a 'novel question of law,' resolution of which is 'necessary to guide future action by law enforcement officers and magistrates.'" *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003) (quoting *Pena-Rodriguez*, 110 F.3d at 1130 n.10). If such a novel question of law is present, the Court should "proceed directly to the probable cause inquiry." *United States v. Gallegos*, 239 Fed. App'x 890, 893 (5th Cir. 2007). Marks has not suggested any such legal issue, and the Court does not discern one independently. Consequently, there is no novel question that requires further analysis.

### 1. The Warrant Applications Provided Sufficient Indicia of Probable Cause

In considering Marks's motion, the Court begins from the premise that "[a] magistrate's determination of probable cause is entitled to great deference by reviewing courts." *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 216 & n.10 (1983)). A magistrate asked to issue a search warrant need only make a "practical common-sense decision as to whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *United States v. Froman*, 355 F.3d 882, 889 (5th Cir. 2004)) (internal quotation marks omitted).

For purposes of the good faith exception, "[w]hen a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity." *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992). "'Bare bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Id.*; *see also United States v. Norsworthy*, 654 F. Supp. 2d 581, 590 (S.D. Tex. 2009) ("[A]n affidavit is insufficient if it simply includes something analogous to the phrase: affiant has cause to suspect and reason to believe that contraband is located on the premises.").

The affidavits accompanying the warrant applications were not bare-bones affidavits as might preclude the good faith exception. To the contrary, they describe a complex criminal investigation that unfolded over the course of a year and involved roughly a dozen targets, various locations across South Texas, extensive undercover activity, and sophisticated electronic surveillance. Accordingly, there is no basis to

second-guess the magistrate's conclusion that probable cause existed as to each of the search warrants issued.[2]

Marks protests that all of the warrant applications improperly relied on "copycat" affidavits, as the bulk of each affidavit recounts the broader investigation and only a portion specifically addresses the particular property to be searched. She has not cited any authority, however, that prohibits law enforcement from using similar affidavits in warrant applications for multiple locations that are all alleged to relate to the same course of criminal conduct. Nor does the Court see any constitutional problem with what appears to be a common law enforcement practice. *See, e.g.*, *United States v. McKeever*, 5 F.3d 863, 865 (5th Cir. 1993) (noting identical affidavits were used to seek multiple warrants); *United States v. Cooper*, 654 F.3d 1104, 1123 n.9 (10th Cir. 2011); *United States v. Pavulak*, 700 F.3d 651, 657 n.2 (3d Cir. 2012).

While her "copycat affidavit" argument relates to all of the warrants at issue, Marks most strenuously challenges the warrant to search the Sealy residence. She urges that, even if there was probable cause to believe that she was engaged in an illegal gambling business, there was no probable cause to search her home for evidence of that crime.

Marks is correct that an application for a warrant to search a residence "must establish a nexus between the house to be searched and the evidence sought." *United*

---

[2] Marks argues that "[f]ederal agents are not to go around looking for state violations and then try to turn them into federal violations." D.E. 153, p. 7. The federal statute prohibiting illegal gambling businesses, however, criminalizes only those state gambling violations that (1) involve five or more people; and (2) either remain in substantially continuous operation for at least 30 days or have gross revenue of more than $2,000 in any single day. 18 U.S.C. § 1955(b). Thus, a violation of a state gambling statute is necessary, but not sufficient, for a conviction under the federal illegal gambling business statute.

States v. Broussard, 80 F.3d 1025, 1034 (5th Cir. 1996). "That nexus may be established, however, by direct observation or through normal inferences as to where the articles sought would be located." *Id.*

The affidavit used to apply for the Sealy warrant furnishes a sufficient nexus between Marks's residence and the evidence the agents hoped to find there. The federal agent who served as the affiant for the Sealy warrant swore that, based on over 20 years' experience in law enforcement, individuals engaged in money laundering and illegal gambling enterprises often store the records and proceeds of their illegal activity in their homes. This is hardly surprising, as "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime." *Payne*, 341 F.3d at 401 (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. Unit B 1981)) (internal quotation marks omitted).

While that generalization alone might not supply sufficient indicia of probable cause, "other facts in the affidavit taken together with generalizations founded upon training and experience could support reasonable reliance." *Id*. at 400 (citation omitted). Specifically, the officers' investigative activity strongly indicated that Marks resided at the Sealy residence, based on (1) public records showing Marks as the listed owner of the Sealy residence; (2) Marks's use of the Sealy address in applying for her driver's license, to open a bank account, and in connection with a $150,000 wire transfer; (3) positional GPS data showing that Marks frequently used her cell phone inside the Sealy address during the course of the investigation; and (4) law enforcement's observation of Marks's Escalade parked outside the residence.

As Marks notes, the Sealy residence is approximately 200 miles from her office in Agua Dulce and the game rooms in Robstown and Bishop. But "an affidavit need not present a watertight criminal case to support good-faith reliance on a warrant." *United States v. Cherna*, 184 F.3d 403, 410–11 (5th Cir. 1999). Geographic distance aside, Marks reportedly told the cooperating defendant that she had been running gambling rooms in the Agua Dulce area for twelve years, and she allegedly oversaw three different illegal gambling rooms over a six-month period, one of which she abruptly shuttered to avoid detection by federal law enforcement. Normal inferences about human behavior suggest that the ringleader of a long-term, large-scale illegal gambling enterprise might store evidence of that enterprise in her home. *See United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977) (upholding warrants to search homes of alleged perpetrators of multi-year number-running scheme based on "normal inferences as to where the articles sought would be located").

Based on the detailed allegations of the affidavits, the Court concludes that the executing officers could reasonably rely on the search warrants' validity. Marks's challenge to the sufficiency of probable cause therefore fails.

### 2. The Warrants Satisfied the Fourth Amendment's Particularity Requirement

Next, Marks argues that the warrants constituted impermissible "general warrants" because they failed to particularize the locations to be searched and the items to be seized.

To satisfy the Fourth Amendment's particularity requirement, "[t]he description in the warrant must be such that a reasonable officer would know what items he is permitted to seize." *United States v. Aguirre*, 664 F.3d 606, 614 (5th Cir. 2011). The purpose of the particularity requirement is "to leave 'nothing . . . to the discretion of the officer executing the warrant.'" *Allen*, 625 F.3d at 834–35 (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). Still, "[r]easonable specificity is required, not 'elaborate detail.'" *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012) (quoting *United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994)).

Under the good faith exception, an insufficiently particularized warrant does not necessarily require suppression, as "not every deficient warrant is so deficient that an officer would lack a reasonable basis for relying on it." *Allen*, 625 F.3d at 838. The question is whether "a reasonably well-trained officer could have concluded that the warrant satisfied Fourth Amendment particularity." *Triplett*, 684 F.3d at 505. The Court must consider the warrant, the accompanying affidavit, and any attachments as a whole. *See Aguirre*, 664 F.3d at 614.

Each of the warrants for the four addresses authorized law enforcement to seize:

(A) Gaming machines, coin operated machines, all gambling devices.

(B) Records, papers, documents, receipts, ledgers, books, documentation relating to money wire transfers conducted through banking institutions, and/or companies such as Western Union or Money Gram International.

(C) Currency, financial records and other tangible items relating to the money laundering; insurance records,

> loan applications and records, real estate records; money drafts, certificates of deposits, money orders, cashier's checks, credit cards, debit cards, pre-paid credit/debit cards, safety deposit box keys, documents and items evidencing the obtaining, expenditure, secreting, transfer and/or concealment of assets, currency and/or currency equivalent, financial instruments.
>
> (D) Safes, lock boxes, data safe, media safe, floor safe, fire resistant safes, cash handling storage safes, filing cabinet storage safe, all types of strong storage devices and all contents therein.
>
> (E) Computers, laptops, all electronic storage devices (along with related peripherals), Secure Digital cards (SD cards), CD-ROMs, DVDs, phones, tablets.
>
> (F) Items manufactured or modified to conceal evidence of the ongoing conspiracy.

"[A] warrant may satisfy the requirements of the Fourth Amendment even though it describes the objects to be seized only in generic terms." *United States v. Humphrey*, 104 F.3d 65, 69 (5th Cir. 1997). Still, certain of the warrants' categories—in particular the second and third items—approach an "all records" warrant, of the type that requires "much closer scrutiny" and should be sanctioned "only in extreme cases" when relating to a residence. *Id*. at 69 & n.2.

The Court nonetheless concludes that the warrants at issue exhibit sufficient particularity that suppression would not serve the purposes of the exclusionary rule. In so holding, the Court notes that the warrant in *Humphrey* cast a similarly wide net, as it authorized seizure of any documents related to "financial transactions or relationships with financial institutions" or "the use of credit cards or debit cards," among other things. *Id*. at 68 n.1. Still, the Fifth Circuit found no error in allowing the fruits of the search into

evidence, based on "the pervasive nature of the fraud, the considerable overlap of the Humphreys' business and personal lives, and the limitation of the warrant to records pertaining to financial transactions." *Id*. at 69. Likewise, *Cherna* rejected a particularity challenge to a search warrant that authorized the seizure of all "[r]ecords and items related to Fraud by Wire and Mail Fraud" found at a single address alleged to be both the defendant's home and place of business. 184 F.3d at 411, 412.

Here, "the crimes alleged in the affidavit could reasonably be viewed as requiring a search of this magnitude." *United States v. Loe*, 248 F.3d 449, 462 (5th Cir. 2001). The Court notes again the breadth of Marks's alleged illegal gambling operations as a factor supporting the search warrants' facial validity. Moreover, the affidavits indicate that Marks extensively documented her criminal conduct by using a computer program to prepare weekly ledgers for her vendors showing the payouts from their machines. The sophistication of her alleged operation therefore merits seizure of broader categories of evidence than would be appropriate for a smaller-scale criminal venture. The third category of items to be seized is also cabined somewhat by referencing "tangible items relating to the money laundering," and the seizure of documents relating to wire transfers appears justified based on the $150,000 wire transfer alleged in the affidavit for the Sealy residence. The Court therefore finds no particularity problem with the list of items to be seized, and even if there were, it is not one that is so glaring that it precludes application of the good faith exception. *See United States v. Davis*, 226 F.3d 346, 352 (5th Cir. 2000) (even though warrant authorized seizure of "generic categories of documents, rather than specific documents," good faith exception applied because the warrant's

supporting materials described the evidence to be seized "in as much detail as is practicable").

Marks next argues that the warrants did not sufficiently incorporate by reference the supporting materials presented to the magistrate judge who found probable cause to search. At the suppression hearing, she established that the affidavits accompanying the warrant applications did not explicitly reference Attachment B to the warrant, which contained the list of items to be seized.

However, with the exception of the safe deposit box warrant, the warrants themselves—which, along with each of the affidavits, were all signed by the magistrate judge—do uniformly reference an Attachment B.[3] An officer executing the warrant thus would have known to look to Attachment B to know what to seize.

Assuming arguendo that the Fourth Amendment requires an affidavit accompanying a search warrant application to reference every attachment to the warrant, on these facts, the good faith exception would still apply. For instance, in *Allen*, the Government conceded that the warrant failed the particularity requirement because it did not incorporate by reference the list of items to be seized. *See* 625 F.3d at 838. The Fifth Circuit nonetheless affirmed the district court's application of the good faith exception, as "[t]he ultimate mistake was not that the documentation was insufficient to support

---

[3] Unlike the four warrants to search buildings, the warrant to search the safe deposit box does not contain a separate page listing the items to be seized. Nonetheless, the Court finds no constitutional infirmity with this search, as (1) both the "Application for a Search Warrant" page and the affiant's signature page were signed by the magistrate judge; and (2) the affidavit itself states the items to be seized from the search of the safe deposit box, namely "financial proceeds and evidence of criminal activity, to include: ledgers and financial documents." *See* D.E. 125-2, p. 11; *cf. Allen*, 625 F.3d at 839 ("[T]he magistrate judge's signature on the affidavit reduces the concern that he did not agree to the scope of the search as defined and limited therein.").

issuance of the warrant, but that the attachment and affidavit were not properly incorporated into the warrant by reference." *Id.* Hence, any technical error in the preparation of the warrant applications was not so obvious that any reasonable officer would have noticed it and concluded that, despite the magistrate's blessing, the warrant was unworthy of reliance. *See id.* at 840 ("The negligent mistake in the warrant does not require 'the extreme sanction of exclusion.'" (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009))); *see also Cherna*, 184 F.3d at 412 (applying good faith exception because any constitutional defect in harmonizing warrant and its supporting materials "could have been remedied with only minor corrections, such as the attachment of the affidavit").

In sum, the Court concludes that the warrants were sufficiently particularized for the good faith exception to apply.[4]

### B. Law Enforcement Did Not Exceed the Scope of the Warrant

Beyond challenging the facial validity of the warrants, Marks claims that the manner in which the warrants were executed transgressed the bounds of the Fourth Amendment.

---

[4] Addressing the officers' seizure of her electronic devices, Marks cites *United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir. 2005) for the proposition that "warrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material." D.E. 153, p. 6 (citing *Riccardi*, 405 F.3d at 862). No evidence has been presented to the Court, however, as to whether law enforcement has undertaken to search the devices that were seized, and if so, what their efforts have entailed or whether they have sought additional warrants to do so. As such, the Court holds only that the executing officers could reasonably have concluded that the warrants satisfied the particularity requirement with respect to the types of items to be seized, including electronic devices, and reaches no conclusion regarding any subsequent searches of those electronic devices or any evidence seized therefrom.

Marks first alleges that the executing officers exceeded the scope of the Sealy warrant by breaking open locked safes they found there. However, that warrant specifically authorized the seizure of "[s]afes, lock boxes . . . all types of strong storage devices ***and all contents therein***." D.E. 125-1, p. 16 (emphasis added). "Some interpretation is unavoidable" when executing a warrant, and "[o]fficers are 'not obliged to interpret [the warrant] narrowly.'" *Triplett*, 684 F.3d at 504 (quoting *Hill*, 19 F.3d at 987). Hence, the executing officers reasonably could have construed the warrant to permit them to force a locked safe open in order to seize its contents.

Moreover, the warrant authorized the seizure of various items that safes are frequently used to store, such as documents, ledgers, currency, and safe deposit box keys. The permissible scope of a lawful search "generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). For example, "a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found." *Id.* at 821. It is also the case that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States,* 441 U.S. 238, 258 (1979).

At the suppression hearing, Homeland Security Special Agent Douglas MacQuarrie, who signed the affidavit for the warrant for the Sealy address and was present during its execution, testified that Marks's husband was home during the search of the Sealy residence. Marks's husband apparently told the agents he did not know the

combinations to some of the safes and that he did not object to their breaking them open.[5]

Thus it was reasonable for the officers to proceed with breaking the safes open while still on-site.[6] *See United States v. Church*, 823 F.3d 351, 357 (6th Cir. 2016) (police did not violate the Fourth Amendment by prying open locked safe because they had probable cause to believe drugs were inside and owner refused to provide the combination), *cert. denied*, 137 S. Ct. 255 (2016).

Marks also contends that the officers exceeded the scope of the warrant by seizing property not named in the Sealy warrant, including several watches and Marks's Escalade. As a preliminary matter, it is debatable whether the Escalade and the watches are in fact outside the letter of the warrant, which authorized seizure of "tangible items relating to the money laundering" and "items evidencing the . . . expenditure . . . and/or concealment of assets." The executing officers could have reasonably considered the Cadillac and the jewelry to fall into one or both of these categories of property which the warrant expressly authorized them to seize. *See United States v. Willey*, 57 F.3d 1374, 1390 (5th Cir. 1995) (jewelry and vehicles fell within the scope of warrant authorizing

---

[5] While the parties have not focused on the question of consent, the Court notes as well that the officers executing the search warrant were also likely justified in forcing open the safes based on Marks's husband's consent. *See United States v. Gonzales*, 508 Fed. App'x 288, 290 (5th Cir. 2013) (upholding search of locked briefcase based on consent given by defendant's live-in girlfriend).

[6] Marks relies on *United States v. Ibarra*, 965 F.2d 1354 (5th Cir. 1992) (en banc) to argue that it was unreasonable to break the safes open, but that case is inapposite. *Ibarra* held that law enforcement exceeded the scope of a defendant's consent to search when they used a sledgehammer to knock a hole in the ceiling while looking for drugs. *Id*. at 1358. Here, the search was premised on the magistrate judge's determination that there was probable cause to believe evidence of money laundering and/or running an illegal gambling business might be inside any safes found at the Sealy residence, thus justifying the forcible opening of the safes. *See United States v. Weinbender*, 109 F.3d 1327, 1330 (8th Cir. 1997) (upholding search where police removed drywall from an interior closet while executing a warrant authorizing seizure of clothes and shoes believed to be evidence of crime, as there was no evidence of "unnecessary destruction of property"); *cf. Koller v. Hoffkins*, No. 3:09-CV-00999 DCP, 2013 WL 7160331, at *8 (D. Conn. Dec. 23, 2013) ("A warrant such as that issued for the Koller residence authorizes officers to empty drawers and closets, to move ceiling tiles, break locks, and open sealed boxes, . . . so long as the containers could reasonably be viewed as concealing items for seizure on the warrant.").

seizure of "fruits, proceeds, evidence and instrumentalities" of money laundering and bankruptcy fraud).

Even if the Escalade and the watches arguably fell outside the warrant's scope, "officers may seize property which is not described in the warrant if the property exhibits a 'sufficient nexus' to the crime under investigation." *Loe*, 248 F.3d at 460–61 (quoting *Creamer v. Porter*, 754 F.2d 1311, 1318 (5th Cir. 1985)). Per the affidavit, Marks told the cooperating defendant that her game rooms netted $130,000 every week, so there is a readily apparent nexus between the significant cash proceeds of the alleged illegal gambling operation and the expensive assets found in the Sealy residence. *See Willey*, 57 F.3d at 1391 ("[M]oney laundering suggests, at least to some extent, the conversion of liquid assets into apparently legitimate tangible property. It is therefore wholly reasonable to suspect that expensive assets in the defendant's possession may be tied to that scheme . . . ."); *cf. Hill*, 19 F.3d at 989 (even if outside the scope of the search warrant, check stubs that were in plain view during execution of warrant could be lawfully seized as evidence of a money structuring offense).[7] And the Government clearly considers the Escalade and watches to represent the fruits of unlawful activity, as they are listed in the superseding indictment as property potentially subject to criminal forfeiture. *See* D.E. 7, p. 3. For these reasons, the executing officers did not act unreasonably in seizing the watches and the car.

---

[7] Marks contends that "[n]ot a single item seized from the residence was illegally in the possession of the Defendant." D.E. 153, p. 7. But the Fourth Amendment allows seizure of non-contraband items where there is "probable cause to believe that the item . . . will be useful in establishing that a crime has been committed." *Hill*, 19 F.3d at 989.

### C. Motion for Return of Property

Finally, Marks moves under Federal Rule of Criminal Procedure 41(g) for the return of the property seized from the Sealy residence. Rule 41(g) states in part that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."

As seen above, there are no grounds for suppression because the searches and seizures conducted pursuant to the warrants did not violate the Fourth Amendment. "Rule 41(g) is broader than the exclusionary rule[,]" however. *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc). Rule 41(g), unlike the exclusionary rule, (1) may be invoked by anyone "aggrieved by . . . the deprivation of property," not just a criminal defendant; and (2) authorizes the return of even lawfully-seized property. *Id*. Therefore the Court's conclusion that the Escalade, watches, cash, and other things were lawfully seized does not necessarily require denial of Marks's motion for the return of property.

Nonetheless, return of the seized property would be inappropriate at this juncture. "A Rule 41(g) motion 'is properly denied if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture or the government's need for the property as evidence continues.'" *Jackson v. United States*, 526 F.3d 394, 397 (8th Cir. 2008) (quoting *United States v. Vanhorn*, 296 F.3d 713, 719 (8th Cir. 2002)). At a minimum, the property that Marks asks to be returned is listed in the superseding indictment as potentially subject to forfeiture. Her motion is denied.

## CONCLUSION

For the foregoing reasons, Marks's amended motion to suppress evidence and to return property (D.E. 153) is DENIED.

ORDERED this 16th day of January, 2018.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE